# In the United States Court of Federal Claims

No. 17-1542C

(Filed: February 14, 2019)

*************************************

| | |
|---|---|
| * | |
| LOCAL INITIATIVE HEALTH | * Patient Protection and Affordable |
| AUTHORITY FOR L.A. COUNTY, d/b/a | * Care Act, §§ 1401, 1402, 1412; |
| L.A. CARE HEALTH PLAN, | * Rule 56 Summary Judgment; Rule |
| | * 12(b)(6) Motion to Dismiss for |
| Plaintiff, | * Failure to State a Claim; Cost |
| | * Sharing Reductions; Premium Tax |
| v. | * Credits; Statutory Interpretation; |
| | * Plain Meaning; Appropriations; |
| THE UNITED STATES, | * Implied-in-Fact Contract Created |
| | * by Statute; Fifth Amendment |
| Defendant. | * Takings. |
| | * |

*************************************

*Lawrence S. Sher*, with whom was *Conor M. Shaffer*, Reed Smith LLP, Washington, D.C. and Pittsburgh, Pennsylvania, for Plaintiff.

*Albert S. Iarossi*, Trial Attorney, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Claudia Burke*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., and *Christopher J. Carney*, Senior Litigation Counsel, *Eric E. Laufgraben* and *Veronica N. Onyema*, Trial Attorneys, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

The Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), created statewide health insurance marketplaces, or "exchanges." Insurers selling health plans on an exchange are referred to as qualified health plan issuers ("QHPs"). Plaintiff Local Initiative Health Authority for L.A. County, doing business as L.A. Care Health Plan ("L.A. Care"), is a QHP offering plans on California's exchange.

The ACA's cost sharing reduction ("CSR") program created a subsidy for certain healthcare-related expenses for eligible exchange plan purchasers. All QHPs must provide CSR discounts to qualified enrollees. The Government then fully reimburses QHPs for their expenses. In late 2017, the Government stopped reimbursing QHPs after 45 consecutive months of making CSR payments. However, L.A. Care continues to provide CSR discounts to its qualifying customers. Accordingly, issuers have been forced to bear the cost of the Government's subsidy alone. The Government's non-payment prompted L.A. Care to bring suit to collect approximately $6 million it was allegedly owed in CSR payments for the 2017 plan year.[1]

Currently before the Court is L.A. Care's motion for partial summary judgment and the Government's cross-motion to dismiss. In its Rule 56 summary judgment motion, L.A. Care seeks to hold the Government liable for statutory and regulatory violations. L.A. Care asserts that the plain language of the ACA and its implementing regulations obligate the Government to make full CSR payments to QHPs in advance of the issuers' actual incurred costs. Alternatively, L.A. Care argues that the CSR program created an implied-in-fact contract between itself and the Government which the Government has now breached. The Government disagrees with both theories of liability.

Pursuant to Rule 12(b)(6), the Government has cross-moved to dismiss all of L.A. Care's CSR-related claims in Plaintiff's complaint. In addition to the aforementioned claims, Defendant requests dismissal of L.A. Care's claim for a taking without just compensation in violation of the Fifth Amendment to the Constitution. Defendant argues that Plaintiff cannot state a takings claim because L.A. Care has no cognizable property right to CSR payments.

After careful consideration, the Court finds the Government liable under both of L.A. Care's theories of recovery. The Government violated the express terms of the ACA and implementing regulations which require full, advanced CSR reimbursement payments. In the alternative, the Court finds that the ACA, its implementing regulations, and the circumstances surrounding their passage created an implied-in-fact contract between the Government and L.A. Care. The Government has since breached that contract. However, though L.A. Care's contractual rights are recognizable property rights under the Fifth Amendment, L.A. Care's property has not been taken. Plaintiff's motion for partial summary judgment is therefore GRANTED, and Defendant's cross-motion to dismiss is GRANTED in part and DENIED in part.

---

[1] During oral argument, counsel for L.A. Care stated its intention to amend its complaint to update the damages amount to account for the 2018 plan year. Counsel estimated that this would increase the total damages sought to approximately $64 million.

<u>Background</u>

A. <u>Congress Creates the ACA and Subsidy Programs</u>

Enacted in 2010, the ACA introduced a series of sweeping reforms aimed to expand the availability of health insurance nationwide. <u>See</u> <u>King v. Burwell</u>, 135 S. Ct. 2480, 2485 (2015). In pursuit of that goal, the ACA created a network of "health benefit exchanges" ("exchanges") to serve as "marketplaces in each state wherein individuals and small groups [can] purchase health insurance." <u>Moda Health Plan, Inc. v. United States</u>, 892 F.3d 1311, 1314 (Fed. Cir. 2018) (citing 42 U.S.C. § 18031(b)(1)). All exchange-offered plans are categorized by "metal level" (bronze, silver, gold or platinum), which indicates the split between the cost of the customer's medical care that the issuer will cover and the cost that the customer must bear. <u>See</u> 42 U.S.C. § 18022. For example, under a silver plan (the second-lowest plan offered on a given exchange), a QHP pays approximately 70 percent of the enrollee's healthcare costs, and the enrollee is responsible for the remaining roughly 30 percent. <u>See</u> § 18022(d)(1)(B).[2]

The ACA also established two subsidies for offsetting healthcare costs of low-income customers. It outlines these programs in sections 1401 and 1402.

In section 1401, Congress amended the Internal Revenue Code to provide a "premium tax credit" for issuers to subsidize health insurance premiums for customers earning between 100 and 400 percent of the federal poverty level (among other criteria). <u>See</u> 26 U.S.C. § 36B. The tax credit is paid directly to the insurer, and the amount is generally equal to the premium for the silver level plan available on that exchange. <u>See</u> <u>id.</u> The ACA amended the permanent appropriation for refunds from certain enumerated tax credits to include these premium tax credits. <u>See</u> 31 U.S.C. § 1324(b)(2).

Section 1402 established the CSR program. To qualify for this subsidy, ACA customers must be enrolled in a silver plan and have a household income below 250 percent of the federal poverty level. <u>See</u> 42 U.S.C. § 18071. After the Department of Health and Human Services ("HHS") certifies a customer's eligibility, QHPs must reduce some portion of that customer's "deductibles, coinsurance, copayments, or similar charges" (collectively, "out-of-pocket expenses"). <u>See</u> § 18071(a)(2); § 18022(c)(3)(A). In turn, the Government "shall make periodic and timely payments to the issuer equal to the value of the reductions." § 18071(c)(3)(A). Congress left funding for the CSR program to the annual appropriations process.

Section 1412 of the ACA charges the HHS Secretary and Secretary of the Treasury with, among other things, establishing a payment procedure for both subsidies. <u>See</u> § 18082(a)(1). Relevant to the CSR program, the Treasury Secretary "shall make such

---

[2] All QHPs participating in an exchange must offer at least one silver level plan. <u>See</u> § 18071(c)(2).

advance [CSR] payment [to a QHP] at such time and in such amount as the [HHS] Secretary specifies . . . ."  <u>See</u> § 18082(c)(3).

B.  <u>HHS Implements the CSR Program</u>

The ACA tasked the Secretary of HHS with overseeing the CSR program.  <u>See</u> ACA §§ 1001, 1301(a)(1)(C)(iv), 1302(a)–(b), 1311(c)–(d).  Accordingly, HHS promulgated regulations implementing the program.  Generally, HHS maintains that QHPs "will receive periodic advance payments [for CSR discounts made to qualifying customers] based on the advance payments amounts calculated in accordance" with the methodology outlined in that subchapter.  45 C.F.R. § 156.430(b)(1).  The agency has also spoken about CSR reimbursement payments through rulemaking and guidance publications.  Its position has historically been consistent.

In 2013, HHS published its official CSR payment policy in the Federal Register which provided that the Government would make "monthly advance payments to issuers to cover project cost-sharing reduction amounts and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts."  78 FR 15409, 15486 (Mar. 11, 2013).  This rule was grounded in HHS' understanding that section 1402 required that "QHP issuers will be made whole for the value of all cost-sharing reductions provided through the reconciliation process after the close of the benefit year."  <u>Id.</u> at 15488.  Moreover, HHS added that it promulgated this rule to "fulfill[] the Secretary's obligation to make 'periodic and timely payments equal to the value of the reductions' under section 1402(c)(3) of the Affordable Care Act."  <u>Id.</u>

HHS published a second rule on section 1402 in 2014 consistent with its prior interpretation.  That rule maintained that "Section 1402(c)(3) of the Affordable Care Act . . . directs the Secretary to make periodic and timely payments to the QHP issuer equal to the value of those reductions."  79 FR 13743, 13805 (Mar. 11, 2014).

In a 2015 guidance bulletin on CSR payments, HHS reiterated that the ACA "requires [QHPs] to provide cost-sharing reductions to eligible enrollees . . . and provides for issuers to be reimbursed for the value of those cost-sharing reductions."  Bulletin, CMS, <u>Timing of Reconciliation of Cost-Sharing Reductions for the 2014 Benefit Year</u> at 1 (Feb. 14, 2015).  HHS echoed this same sentiment in a 2016 manual, stating that "periodic and timely payments equal to the value of those reductions are required to be made to issuers . . . in advance."  Bulletin, CCIIO and CMS, <u>Draft Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Year 2016</u> at 5 (Nov. 2, 2016).  Congress has neither repealed nor amended sections 1402 or 1412.

C. <u>L.A. Care Offers Plans on the California ACA Exchange</u>

After the ACA's passage, L.A. Care sought to participate as a QHP on the California ACA Exchange.  To qualify as a QHP, the ACA requires issuers to offer a package of "essential health benefits" on an exchange.  <u>See</u> 42 U.S.C. § 18021(a)(1).  L.A. Care developed the requisite plans and premiums, was certified as a QHP by California state healthcare regulators, and began offering plans on January 1, 2014 (the day the exchanges opened).  It has participated as a QHP on the California Exchange every year since, and its current contract extends through December 31, 2019.  L.A. Care asserts (and the Government does not challenge) that it has made CSR payments to eligible customers in compliance with its statutory duty.

D. <u>History of CSR Payments</u>

In anticipation of the exchanges' January 1, 2014 launch, the prior Administration requested an appropriation to carry out section 1402's CSR program.  <u>United States House of Representatives v. Burwell</u>, 185 F. Supp. 3d 165, 172-74 (D.D.C. 2016).  Congress declined.  <u>Id.</u> at 173-74.  Notwithstanding the lack of funds, the Government began making monthly advance CSR payments to QHPs (including L.A. Care) in January 2014, drawing the necessary money from the permanent appropriation for tax credit refunds established in 31 U.S.C. § 1324.  <u>Id.</u> at 174.

The House of Representatives viewed this as a misuse of funds for a non-appropriated purpose in violation of the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and sued to enjoin further CSR payments.  The district court agreed, holding that Congress could not fund section 1402's CSR program from the permanent appropriation for section 1401's premium tax credits.  <u>Id.</u> at 177-79.  The court enjoined further payments, but stayed the injunction pending appeal.  <u>Id.</u> at 189.  The circuit court stayed the appeal of that decision while the newly elected Administration reconsidered their predecessor's legal position on this issue.  <u>United States House of Representatives v. Burwell</u>, 676 F. App'x 1 (Mem.) (D.C. Cir. 2016).  QHPs continued to receive monthly advance CSR payments during these stays.

In October 2017, the current Administration officially reversed course.  In a letter to the Treasury Secretary and Acting HHS Secretary, the Attorney General advised "that the best interpretation of the law is that the permanent appropriation for 'refunding internal revenue collections,' 31 U.S.C. § 1324, cannot be used to fund the CSR payments to issuers authorized by 42 U.S.C. § 18071."  Letter from Jefferson B. Sessions III, U.S. Attorney Gen., to Steven Mnuchin, Sec'y of the Treasury & Don Wright, Acting Sec'y of HHS (Oct. 11, 2017).  The next day, the Acting Secretary of HHS sent a memorandum to its Centers for Medicare and Medicaid Services ("CMS") explaining that "CSR payments are prohibited unless and until a valid appropriation exists."  Memorandum from Acting Sec'y of HHS Eric Hargan to Adm'r of CMS Seema Verma, Payments to Issuers for Cost-Sharing

Reductions (CSRs), at 1 (Oct. 12, 2017).  The Government stopped making CSR payments to QHPs in and after October 2017, ending its streak of 45 consecutive monthly advance CSR payments.  Congress has still not appropriated any money for the CSR program.

E.   The Present Dispute

L.A. Care now asserts two separate theories of liability to recover $5,969,171.49 in damages for these allegedly past-due CSR reimbursements.[3]  First, it argues that the plain language of section 1402, section 1412, and HHS' regulations implementing the CSR program compel the Government to make advance monthly CSR payments to QHPs. Plaintiff advances that Congress' mere failure to appropriate funds for the CSR program does not change that obligation.  In response, the Government contends that the ACA's structure and Congress' failure to make appropriations demonstrates Congress' intent not to create an enforceable obligation to make CSR payments.

Second, L.A. Care argues that the Government entered into an implied-in-fact contract with L.A. Care.  Taken together, L.A. Care claims that the obligatory language in sections 1402 and 1412 and their implementing regulations along with the circumstances surrounding their passage, evidence a bargained-for exchange binding itself and the Government to perform their respective roles under the CSR program.  The Government, L.A. Care maintains, breached that contract when it failed to make timely CSR payments. Plaintiff adds that this contractual arrangement and subsequent breach constituted a taking under the Fifth Amendment.  The Government views the sources L.A. Care cites as simply establishing an incentive program, and in no way indicate an intent to contract.  As such, L.A. Care therefore does not possess a cognizable property right under the Fifth Amendment according to the Government.

Procedural History

L.A. Care filed its complaint on October 16, 2017 (amended on February 8, 2018) seeking damages equal to those that would have been paid to Plaintiff under the ACA's risk corridors and CSR programs for the 2017 plan year—$25,765,038.33 in total.  Upon the Government's request, the Court stayed Plaintiff's claims relating to the risk corridors program on March 5, 2018 pending the final resolutions of Land of Lincoln Mutual Health Insurance Co. v. United States, 129 Fed. Cl. 81 (2016), aff'd, 892 F.3d 1184 (Fed. Cir. 2018) and Moda Health Plan, Inc. v. United States, 130 Fed. Cl. 426 (2017), rev'd, 892 F.3d 1311 (Fed. Cir. 2018).  The plaintiff in Moda Health (along with other insurers) petitioned the United States Supreme Court for certiorari on February 4, 2019.

Plaintiff moved for summary judgment under Rule 56 on Counts V and VI—two of its CSR-related claims—on September 19, 2018.  On October 19, 2018, Defendant

---

[3] As discussed in Footnote 1, this figure may be incomplete.

responded and cross-moved to dismiss Plaintiff's CSR-related claims for failure to state a claim under Rule 12(b)(6).  In addition to Counts V and VI, Defendant requested dismissal of Count VII.  That count alleges an impermissible taking under the Fifth Amendment.  Plaintiff filed its response and reply on November 13, 2018, and Defendant filed its reply on November 27, 2018.  The Court heard oral argument on January 4, 2019.

Other judges on this Court have weighed in on certain issues presented in this case.  Most recently, Judge Kaplan issued a decision in Montana Health Co-Op v. United States, 139 Fed. Cl. 213 (2018).  Montana Health, a QHP, claimed damages for statutory violations and breach of an implied-in-fact contract arising from the Government's failure to make CSR payments.  Judge Kaplan granted summary judgment for Montana Health, holding that the Government violated its statutory obligation when it failed to make CSR payments.  See id. at 215.  The Montana Health court chose not to address the plaintiff's contract claim "in light of [the court's] favorable disposition of Montana Health's statutory claim."  Id. at 216 n.4.  The appeal of that decision is now before the U.S. Court of Appeals for the Federal Circuit.

## Discussion

### A.  The Court Has Subject-Matter Jurisdiction Over Both of L.A. Care's Claims

#### 1.  Standard of Review

The United States, as sovereign, is immune from suit unless it consents to be sued.  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The Tucker Act, 28 U.S.C. § 1491(a)(1) (2012), waives sovereign immunity for claims predicated on the Constitution, a federal statute or regulation, or a contract with the Government.  Still, the Tucker Act does not create a separate right to money damages.  A plaintiff suing the Government for money damages must therefore base its claims upon a separate source of law that creates such a right.  See United States v. Testan, 424 U.S. 392, 398 (1976).  L.A. Care predicates its claims on Section 1402 and 1412 of the ACA and implementing regulations, or, in the alternative, on an implied-in-fact contract between it and the United States.

#### 2.  The Court Has Subject-Matter Jurisdiction Over L.A. Care's Statutory Claim.

Where a plaintiff bases its claims on a statutory or regulatory provision, courts generally find that the provision is money-mandating if it provides that the Government "shall" pay an amount of money.  Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007).  Section 1402 states that the Government "shall make periodic and timely [CSR] payments." 42 U.S.C. § 18071(c)(3)(A).  Similarly, section 1412 provides that "Treasury shall make such advance [CSR] payment."  § 18082(c)(3).  Clearly, the statutes use the "shall" pay language characteristic of a money-mandating provision.  They

are therefore money-mandating, and the Court has subject-matter jurisdiction over L.A. Care's statutory claim as a result.

### 3. The Court Has Subject-Matter Jurisdiction Over L.A. Care's Contractual Claim.

Where a plaintiff claims that the Government has breached an implied-in-fact contract, it need only make a "non-frivolous *allegation* of a contract with the government." Mendez v. United States, 121 Fed. Cl. 370, 378 (2015) (quoting Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011)) (emphasis in original). To show jurisdiction, a plaintiff must therefore plead the elements of a contract with the Government: "(1) mutuality of intent to contract; (2) consideration; (3) an unambiguous offer and acceptance; and (4) actual authority on the part of the government's representative to bind the government." Fisher v. United States, 128 Fed. Cl. 780, 785 (2016) (quoting Biltmore Forest Broad. FM, Inc. v. United States, 555 F.3d 1375, 1380 (Fed. Cir. 2009) (citation omitted)).

L.A. Care alleges that sections 1402 and 1412 of the ACA and HHS' implementing regulations reveal the Government's intention to contract with issuers. In this bargain, L.A. Care agreed to offer plans on an exchange and act as a conduit for the Government's CSR subsidy, and, in return, the Government would reimburse issuers for their CSR-related expenses. Under this theory, each party brings meaningful consideration to the exchange. L.A. Care further alleges that the ACA and its implementing regulations constituted an offer to enter into a unilateral contract. L.A. Care accepted that offer by developing and selling plans on an exchange and providing CSR discounts to qualifying customers. Lastly, L.A. Care asserts that the HHS Secretary had authority to contract on the Government's behalf. It points to the statutory language directing the Secretary to implement the ACA as authorizing this official to enter into contracts with QHPs. Plaintiff has sufficiently alleged the existence of an implied-in-fact contract, and, as such, the Court has subject-matter jurisdiction to hear Plaintiff's contract claim.

## B. L.A. Care's Motion for Partial Summary Judgment Succeeds

### 1. Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). A fact is "material" if it might significantly alter the outcome of the case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing that there exists no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment will not be granted if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court's function is not to weigh

the evidence and determine the merits of the case presented, but to determine whether there is a genuine issue of material fact for trial.  Id. at 249; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).

### 2.   The Government Must Make CSR Payments Per the ACA's Terms.

#### a.   Section 1402 Requires Advanced CSR Payments.

The Court begins with the purely legal question of whether sections 1402 and 1412 of the ACA and their implementing regulations require the Government to make full advance CSR payments to QHPs despite the absence of an appropriation to fund any such payment.  That analysis starts with the statutory text itself.  See Res-Care, Inc. v. United States, 735 F.3d 1384, 1388 (Fed. Cir. 2013) (citations omitted).  When "statutory language is plain and unambiguous, then it controls."  Id.  (citing Chevron, U.S.A. v. NRDC, Inc., 467 U.S. 837, 843 n.9 (1984)).

Section 1402 reads: "An issuer of a qualified health plan making reductions under this subsection shall notify the [HHS] Secretary of such reductions and the Secretary *shall* make periodic and timely payments to the issuer equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A) (emphasis added).  That provision can only mean one thing: the Government must repay QHPs for their CSR expenses.  The unambiguous "shall make" language indicates a binding obligation to pay that the Court is powerless to construe any differently.  See, e.g., Lopez v. Davis, 531 U.S. 230, 241 (2001) (noting Congress' "use of the mandatory 'shall' . . . to impose discretionless obligations"); Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) (Congress' use of the word "shall" in a statutory provision "normally creates an obligation impervious to judicial discretion."). QHPs must be repaid, but section 1402 specifies no timeframe for these payments apart from that they must be "periodic and timely."  For that, the Court must turn to section 1412.

Section 1412 permits CSR payments to be made in advance but leaves the payment schedule to the HHS Secretary's discretion.  See § 18082(c)(3) ("The Secretary of the Treasury shall make such advance [CSR] payment at such time and in such amount as the [HHS] Secretary specifies . . . .").  Pursuant to that grant of authority, the Secretary promulgated rules entitling QHPs to full CSR payments in advance of their actual incurred costs.  See 45 C.F.R. § 156.430(b)(1) (QHPs "will receive periodic advance payments"); 78 FR 15409, 15486 (Mar. 11, 2013) (the Government will make "monthly advance payments to issuers to cover project cost-sharing reduction amounts").  Accordingly, section 1412 and HHS' implementing regulations act together to commit the Government to making full advanced CSR payments to L.A. Care.  HHS' history of making 45 consecutive such payments supports the Court's understanding of the Government's chosen payment schedule.

b.  Defendant's Alternate Interpretations are Unavailing.

Rather than focus on the clear statutory language, the Government encourages examination of other indicia of Congressional intent like the relevant provisions' structure and design.  It first points to Congress' failure to appropriate funds for the CSR program as evidence that Congress never intended to bind the Government to make CSR payments.

That interpretation is flatly inconsistent with over a century of case law and, most recently, with the Federal Circuit's decision in Moda Health.  The appeals court examined whether section 1342 of the ACA required the Government to make risk corridor payments despite the absence of a valid appropriation.  See 892 F.3d at 1314.  Section 1342 "provides that '[t]he Secretary *shall* establish and administer' a risk corridors program pursuant to which '[t]he Secretary *shall* provide' under the program that 'the Secretary *shall* pay' an amount according to the statutory formula."  Id. at 1320 (quoting 42 U.S.C. § 18062) (emphasis in original).  The Federal Circuit determined that statutory language (which closely tracks the language in sections 1402 and 1412) to be "unambiguously mandatory." Id.  The lack of ambiguity led to the "conclu[sion] that the plain language of section 1342 created an obligation of the government to pay participants in the health benefit exchanges the full amount indicated by the statutory formula."  Id. at 1323.[4]  Whether a valid appropriation existed to honor that commitment was irrelevant because the initial "obligation existed . . . independent of a sufficient appropriation to meet the obligation." Id. at 1322; see also United States v. Langston, 118 U.S. 389 (1886) (statute created an enforceable obligation despite Congress' failure to fund that obligation).

Put differently, whether a statute creates a commitment and whether there are funds available to honor that commitment are two independent inquiries.  Moda Health, 892 F.3d at 1321 ("[I]t has long been the law that the government may incur a debt independent of an appropriation to satisfy that debt . . . .").[5]  Congress can relieve that obligation to pay, but only when the statute's plain language limits the Government's liability to an amount appropriated by Congress.  See, e.g., Prairie County, Montana v. United States, 782 F.3d 685, 689 (Fed. Cir. 2015) (relieving the Government of its obligation to pay because the statute identified a limited source of funding to meet that obligation); Star-Glo Associates, LP v. United States, 414 F.3d 1349, 1353 (Fed. Cir. 2005) (holding that the clause providing that "[t]he Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section" acted as a cap on the Government's obligation).  That is not the case here.

---

[4] The Federal Circuit later found that subsequent appropriations riders canceled that obligation.

[5] As the court in Moda Health noted, an appropriation "merely imposes limitations upon the Government's own agents; it is a definite amount of money entrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties."  Id. at 1321 (quoting Ferris v. United States, 27 Ct. Cl. 542, 546 (1892)).

Consistent with <u>Langston</u> and <u>Moda Health</u>, section 1402 created the Government's obligation to make CSR payments, and this requirement exists independent of an appropriation. Sections 1402 and 1412 do not contain a provision like the express language that limited the Government's obligation in <u>Prairie County</u> and <u>Star-Glo</u>. Congress' failure to appropriate money to fund the CSR program therefore has no impact on the existence of this statutorily-imposed payment obligation.

The Government also puts undue weight on the difference in funding methods for section 1401's and 1402's programs. According to the Government, the choice to fund section 1401's tax refund through a permanent appropriation but to leave funding for the CSR program to the annual appropriations process reveals the drafters' intent not "to expend funds for CSRs absent a subsequent annual appropriation." Def.'s Cross-Mot. to Dismiss and Resp. at 15. This difference is telling, the Government explains, because "when Congress includes particular language in one section of a statute but omits it in another[,] . . . [courts] presume[] that Congress intended a difference in meaning." <u>Digital Realty Trust, Inc. v. Somers</u>, 138 S. Ct. 767, 777 (2018) (quoting <u>Loughrin v. United States</u>, 573 U.S. 351, 358 (2014)).

Though the Government points to <u>Digital Realty</u> for support, the Supreme Court's analysis there instead shows the paramount importance of the text's plain, unambiguous words in statutory interpretation. The <u>Digital Realty</u> court was charged with determining the applicable definition of the term "whistleblower" as it appeared in a statute. <u>Id.</u> at 778. The court rejected interpretations of the term that went beyond the text, ultimately applying the definition of "whistleblower" supplied by the statute without alteration. <u>Id.</u> at 778. The text's plain meaning controlled because "[t]he statute's unambiguous whistleblower definition, in short, precludes the [Securities and Exchange] Commission from more expansively interpreting that term." <u>Id.</u>

The Government is correct that intent is key, and that selective statutory language can be instructive. However, the Government's position would have the effect of improperly overriding the statute's plain meaning. As was the case in <u>Digital Realty</u>, this Court sees no better indication of Congress' intent than the unambiguous words of obligation that it chose to include in section 1402.

The Government's argument also ignores other more telling structural differences which corroborate the Court's understanding of section 1402. In at least four places throughout the ACA, Congress made payment for a program "subject to availability of appropriations." 42 U.S.C. § 280k(a); 42 U.S.C. § 300hh-31(a); 42 U.S.C. § 293k-2(e); 42 U.S.C. § 1397m-1(b)(2)(A). No such conditional language exists in sections 1402 or 1412. This discrepancy more likely indicates an intended "difference in meaning." Congress knew how to condition payment on the presence or absence of an appropriation; it did so in other subsections but not in section 1402. This choice shows a decision to create a binding obligation to make CSR payments to QHPs not predicated on the presence of an

appropriation.  There is no evidence in the text, legislative history, or otherwise to the contrary.

The difference in section 1401's and 1402's funding mechanisms is likely insignificant.  The most reasonable explanation for Congress' decision to fund the CSR program through the annual appropriations process and fund tax refunds through a permanent appropriation is likely the simplest: it intended to fund its two separate programs in two different ways.

Lastly, the Government's interpretation could have serious consequences beyond this program.  Determining that such clear obligatory language nevertheless did not impose an obligation would justifiably increase contractors' skepticism towards working with the Government, striking a serious blow to the future of public-private ventures.

3.  <u>Congress' Failure to Appropriate Funds to the CSR Program Did Not Cancel the Government's Statutory Obligation to Make CSR Payments.</u>

The Court must next consider the impact, if any, of Congress' subsequent failure to appropriate funds for section 1402's and 1412's mandatory CSR payments.  Again, this is an entirely legal inquiry.  "Repeals by implication are not favored."  <u>Langston</u>, 118 U.S. at 393.  That rule "applies with especial force" when the source of the alleged repeal is a subsequent appropriation.  <u>United States v. Will</u>, 449 U.S. 200, 221-22 (1980).  "Whether an appropriations bill impliedly suspends or repeals substantive law 'depends on the intention of [C]ongress as expressed in the statutes.'"  <u>Moda Health</u>, 892 F.3d at 1323 (quoting <u>Mitchell</u>, 109 U.S. at 150).  That intent "must be clearly manifest."  <u>N.Y. Airways, Inc. v. United States</u>, 369 F.2d 743, 749 (Ct. Cl. 1966).

The Federal Circuit in <u>Moda Health</u> grappled with this same issue.  To answer this question, the court revisited <u>Langston</u>, contrasting it with <u>United States v. Mitchell</u>, 109 U.S. 146 (1883).

In <u>Mitchell</u>, the Supreme Court determined that a statute setting salaries for interpreters was impliedly amended when "Congress appropriated funds less than the fixed sum set by statute, with a separate sum set aside for additional compensation at the discretion for the Secretary of the Interior."  <u>Moda Health</u>, 892 F.3d at 1323 (citing <u>Mitchell</u>, 109 U.S. at 149).  This appropriation changed the original statutory obligation because it evidenced:

> [A] change in the policy of [C]ongress on the subject, namely that instead of establishing a salary for interpreters at a fixed amount, and cutting off all other emoluments and allowances, [C]ongress intended to reduce the salaries and place a fund at the disposal of the [S]ecretary of the [I]nterior, from which, at

> his discretion, additional emoluments and allowances might be
> given to the interpreters."

Mitchell, 109 U.S. at 149-50.

Three years later, Langston limited the holding in Mitchell. The Supreme Court distinguished the cases based on the nature of the subsequent appropriations in each. In Langston, a statute set a foreign minister's salary at $7,500 per year, yet Congress appropriated only $5,000 for that official's salary. See 118 U.S. at 393. The court explained that Congress "merely appropriated a less amount" for the official's salary. Id. at 394. Unlike Mitchell, this failure to appropriate funds did not constitute "words that expressly, or by clear implication, modified or repealed the previous law." Id. That appropriation did not evidence an intent to repeal the previous act and had no impact on the original statutorily obligation. Id.

Subsequent cases have fallen into either the Langston or Mitchell camps. That is, failure to appropriate funds to satisfy a statutory obligation do not change that original obligation, whereas failure to appropriate plus some additional, affirmative, and clear indication from Congress to alter the legislation can have an overriding effect. Compare District of Columbia v. United States, 67 Fed. Cl. 292 (2005) (determining that "an appropriation with limited funding is not assumed to amend substantive legislation creating a greater obligation.") (citing N.Y. Airways, 177 F.2d at 749)), with United States v. Dickerson, 310 U.S. 554, 555 (1940) (appropriation providing that "no part of any appropriation" could be used to fund a program altered original statutory obligation), and Will, 449 U.S. at 205-07 (subsequent appropriation stating that "no part of the funds appropriated in this Act or any other Act shall be used to pay the salary" and that the increase in pay "shall not take effect" eliminated a statutorily enacted salary raise); see also N.Y. Airways, 369 F.2d at 748 ("It has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute.").

This case fits squarely into the Langston lineage. Congress has not acted at all here; it passed no bills or riders appropriating funds or limiting appropriations for the CSR program. The situation at hand exemplifies a "bare failure to appropriate funds to meet a statutory obligation" which simply has no impact on the statutory commitment. Moda Health, 982 F.3d at 1323. There has been no indication from Congress that it intended an about-face as to its originally intended obligation. Section 1402's mandate to pay QHPs for their CSR related expenses therefore remains intact.

4.  <u>The Government's Arguments Regarding Plaintiff's Lack of a Damages
Remedy are Unpersuasive.</u>

The Government argues that L.A. Care's claim must fail because Congress did not
intend to supply a remedy for QHPs to recover damages for HHS' failure to make CSR
payments.  It cites two sources for support, neither of which the Court finds compelling.

First, the Government asserts that section 1402 does not authorize either an express
or implied cause of action for an issuer to recover damages.  Def.'s Cross-Mot. to Dismiss
and Resp. at 19.  This argument runs afoul of the long-standing precedent that statutes (like
the ACA) that can be fairly interpreted to be money-mandating both supply jurisdiction in
this Court and provide plaintiffs with a cause of action for damages.  <u>See, e.g.</u>, <u>Fisher v.
United States</u>, 402 F.3d 1167, 1173 (2005) ("[T]he determination that the source is money-
mandating shall be determinative both as to the question of the court's jurisdiction and
thereafter as to the question of whether, on the merits, plaintiff has a money-mandating
source on which to base his cause of action.").  The ACA is money-mandating, and, as
such, L.A. Care need not establish any separate damages remedy.

Second, the Government points to state-level regulators' ability to alter QHPs'
premiums which allows QHPs to recover costs from CSR non-payment as evidence of
Congress' intent not to grant issuers a damages remedy.  After the Government stopped
making CSR payments in late 2017, regulators in over 38 states (including California)
began permitting issuers to account for the termination of CSR payments in setting their
premium rates for the 2018 plan year.  The result was increased premiums for the exchange-
offered plans which, in turn, increased the tax refunds available to the issuer.  This
adjustment allowed QHPs (including L.A. Care) to recoup (at least some) CSR costs.  The
Government argues that Congress could not have intended to pile on an additional damages
remedy.[6]

At bottom, the Government's argument is that section 1402 really provides that the
Government shall make CSR payments to QHPs "unless state regulators in the future
happen to raise premiums, in which case, Congress doesn't owe you."  Oral Arg. Tr. at
24:13-14.  Nowhere in the legislative history, statutory text or implementing regulations
are CSR payments subject to alteration based on the availability of offsetting funds derived
from premium increases permitted by state regulators.  Premium rate adjustment is a state-
specific decision, entirely separate from the CSR program.  Its possibility does not reveal
Congress' decision not to provide a damages remedy for CSR non-payment and therefore
does not impact L.A. Care's ability to recover.  Accordingly, the Court GRANTS
Plaintiff's motion for summary judgment on Count V.

---

[6] The parties do not address the degree to which L.A. Care's damages may have been offset by its ability
to increase premiums.

   5.   The ACA, Implementing Regulations, and Surrounding Circumstances
        Created an Implied-in-Fact Contract Which the Government Breached.

   Next, the Court must consider whether the Government entered into a contractual relationship with L.A. Care through sections 1402 and 1412 of the ACA and HHS' regulations implementing the CSR program. Existence of a contract is essential to L.A. Care's Fifth Amendment takings claim and to Defendant's motion to dismiss that claim. The debate here is not over the facts but whether these agreed facts give rise to a contract. Thus, the question presented is entirely a legal dispute appropriate for summary judgment.

   The elements of an implied-in-fact contract are identical to those of an express contract.  See Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). To establish liability on a breach of contract claim, the plaintiff seeking summary judgment must show that there is no genuine dispute as to four elements: (1) mutuality of intent to contract, (2) consideration, (3) "lack of ambiguity in offer and acceptance," and (4) that the "[G]overnment representative whose conduct is relied upon [has] actual authority to bind the [G]overnment in contract."  Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995) (citation omitted).

   The Government does not intend to bind itself in contract whenever it creates a statutory or regulatory incentive program.  See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465–66 (1985).  Therefore, "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise."  Id. (citation omitted).  Courts should "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation."  Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 631 (Fed. Cir. 2012).

   The Government reasons that L.A. Care's contract claim fails because the relevant ACA provisions and implementing regulations do not "speak in terms of contract."  Def.'s Cross-Mot. to Dismiss and Resp. at 23.  To the Government, the ACA's language alone is determinative of Congress' intent.  However, this inquiry does not begin and end with the text.

   National Railroad provides the relevant framework.  There, the Supreme Court grappled with whether the Government created a contractual arrangement through statute and subsequent agreements between it and railroad operators.  See Nat'l R.R., 470 U.S. at 465.  The statutory language, which was of "first importance" in making this assessment, did not evidence "congressional intention to have the United States enter into a private contractual arrangement" because it did not "speak in terms of contract."  Id. at 466-67. However, the court next turned to the "circumstances surrounding the Act's passage."  Id. at 468.   The parties' legitimate expectations, larger national railroad regulatory context

within which this provision fell, and unfair terms of the alleged contract all suggested that no contract was formed. Id. at 468-69. Accordingly, National Railroad encouraged courts not to treat one source as dispositive, but instead examine all potentially relevant signs of Congress' intent in determining formation of an implied-in-fact contract.

Moda Health took a similar approach when considering if the risk corridors program gave rise to an implied-in-fact contract. The plaintiff claimed that a "combination of [the statutory] text, HHS's implementing regulations, HHS's preamble statements before the ACA became operational, and the conduct of the parties" formed a contract. Moda Health, 892 F.3d at 1329. The court disagreed, but its analysis is telling. It did not rest with the statutory language which it determined "contains no promissory language from which we could find such intent [to contract]." Id. at 1329. Rather, it proceeded to consider the "overall scheme of the risk corridors program." Id. at 1330. The Federal Circuit therefore appeared to engage in a similarly holistic inquiry, not limited to just the statutory language.

Applying the precedent set in National Railroad and Moda Health, the Court must look to all relevant circumstances to discern whether Congress intended to establish a contractual arrangement. See also Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (intent to contract can be inferred from the "conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding."). Accordingly, the Court will assess the language of sections 1402 and 1412, their implementing regulations, and the surrounding circumstances to determine whether a bargain was struck.

### a.   There was Mutuality of Intent to Contract.

The core of this inquiry is whether the situation exemplifies a "traditional quid pro quo" exchange. Moda Health, 892 F.3d at 1330. Hallmarks of such an exchange include (1) whether the provision creates a program that offers specified incentives in return for the voluntary performance of private parties; and (2) whether the provision is promissory, providing agency officials administering the program with no discretion in awarding incentives to parties who perform. See Radium Mines, Inc. v. United States, 153 F. Supp. 403, 405–06 (Ct. Cl. 1957). As detailed above, Congress made an unambiguous promise to repay issuers for their CSR expenses in sections 1402 and 1412, and HHS' implementing regulations. The commitment—that issuers would not be expected to shoulder the cost of the Government's CSR subsidy and would receive full advanced payment—was designed to entice issuers like L.A. Care to voluntarily participate on exchanges. Once a QHP sold its plan on an exchange and paid out-of-pocket costs to qualified plan purchasers, the statutory "shall" used in both sections imposed a discretionless requirement on the Government to pay issuers.

Moda Health is also instructive in drawing a line between an "incentive program" and a quid pro quo exchange which gives rise to a contractual relationship. Important to its decision that the risk corridors program established an incentive program and not a

contract was the lack of a traditional "guarantee" as the court determined existed in <u>Radium Mines</u>.   <u>See</u> <u>Moda Health</u>, 892 F.3d at 1330. There, the Government encouraged stimulation of domestic uranium production by promising to pay private parties a "guaranteed minimum price" for uranium.  <u>See</u> <u>Radium Mines</u>, 153 F. Supp. at 404-05. This program possessed the traditional "trappings of a contractual arrangement" because "the government made a 'guarantee,' it invited uranium dealers to make an 'offer,' and it promised to 'offer a form of contract' setting forth 'terms' of acceptance." <u>Moda Health</u>, 892 F.3d at 1330.  Conversely, the risk corridors program was "an incentive program designed to encourage the provision of affordable health care to third parties without a risk premium to account for the unreliability of data relating to participation of the exchanges— not the traditional quid pro quo contemplated in <u>Radium Mines</u>." <u>Id.</u>  Also important was the fact that an issuer could qualify for risk corridors payments without the encouraged premiums in place. <u>Id.</u>

Like the risk corridors program, the CSR program aims to provide affordable healthcare to exchange customers.  However, that is where the similarities between these programs end.  The risk corridors program acted to calm potential issuers' fears regarding entering a new and unprecedented market.  The CSR program is no such safety net.  Rather, it is a means for distributing a Government subsidy.  The Government chose to distribute that subsidy by asking insurers to act as conduits for payment of certain eligible insureds' out-of-pocket healthcare costs.  Put in <u>Radium Mines</u>' terms, the Government "guaranteed" to cover QHPs' CSR expenses if QHPs made CSR payments to eligible recipients.  There is, undoubtedly, a traditional quid pro quo exchange in that transaction.  The same logic underlying the Federal Circuit's decision in <u>Moda Health</u> therefore does not apply here. Additionally, unlike the risk corridors program, whether a QHP is entitlement to CSR repayment depends entirely on whether it has made CSR distributions to qualifying customers.

The surrounding circumstances reinforce the existence of a contractual arrangement.  As in <u>National Railroad</u>, the legitimate expectations of the parties and whether the would-be contractual arrangement is equitable are especially relevant.  <u>See</u> 470 U.S. at 467-69.  There, the court determined that the plaintiff could not have legitimately believed that it was entering into a contract because (1) the statute "'expressly reserved' its rights to 'repeal, alter or amend'" the statute "at any time," <u>Id.</u> at 467, and (2) Congress had a history of "heavy and longstanding regulation" of the railroad industry.  <u>Id.</u> at 468.  Moreover, under the alleged contract, Congress would have relinquished its longstanding ability to impose rail passenger obligations on railroad operators in exchange for virtually nothing.  <u>Id.</u> at 468-69 (determining that the Government would not have "shed this vitally important governmental power with so little concern for what it would receive in exchange").  Existence of a contract was therefore implausible because "Congress would have struck a profoundly inequitable bargain" had it agreed to the contractual terms that the plaintiff urged existed.  <u>Id.</u> at 469.

Sections 1402 and 1412 and their implementing regulations use unequivocal promissory language leading QHPs to reasonably believe that they would be repaid under this program. Unlike National Railroad, there is no language in those provisions which checked L.A. Care's expectations that it would be repaid. Indeed, there is a bevy of evidence to the contrary. L.A. Care's repayment expectations were reaffirmed time and again by HHS' directives on the CSR program. See 45 C.F.R. § 156.430(b)(1); 78 FR 15409, 15486 (Mar. 11, 2013); 79 FR 13743, 13805 (Mar. 11, 2014); Bulletin, CMS, Timing of Reconciliation of Cost-Sharing Reductions for the 2014 Benefit Year at 1 (Feb. 14, 2015). Moreover, the Government is not getting a raw deal here. The ACA's success hinges on private health insurers' voluntary participation on exchanges. Moreover, the CSR program's design makes issuers the sole means for distributing these out-of-pocket healthcare costs to target recipients. L.A. Care's assent to be an issuer therefore was not just valuable but vital to the success of both the CSR program and ACA generally.

### b. L.A. Care Accepted the Government's Offer.

Since offers are conduct which indicate assent to the proposed bargain, and the Government intended to contract as outlined above, the ACA and its implementing regulations established an offer to form a unilateral contract. In such an arrangement, the offeree may only accept the offer by performing its contractual obligations. See Contract, Black's Law Dictionary (10th ed. 2014) (defining "unilateral contract" as "[a] contract in which only one party makes a promise or undertakes a performance."); see also Lucas v. United States, 25 Cl. Ct. 298, 304 (1992) (explaining that a prize competition is a unilateral contract because it requires participants to submit entries in return for a promise to consider those entries and award a prize). Performance must be in the form of an actual undertaking; simply "fill[ing] in the blanks of a Government prepared form," such as an application, does not constitute acceptance by performance. Cutler-Hammer, Inc. v. United States, 441 F.2d 1179, 1183 (Ct. Cl. 1971).

The Government's offer is clearly laid out in sections 1402 and 1412 and their implementing regulations: it promised to reimburse L.A. Care for its CSR payments in advance if L.A. Care offered plans on an exchange and itself made CSR distributions to qualifying customers. Acceptance of this offer is only possible through L.A. Care performing its half of the bargain.

And L.A. Care did, in fact, accept this offer. It expended resources to develop plans which comported with the ACA's requirements, sold qualifying plans on the California exchange, and made payments to eligible customers to reduce their out-of-pocket expenses as the ACA required. L.A. Care's undertakings were substantial. Its performance was sufficient to act as an acceptance, and, as offeror, the Government's duty to pay has accordingly fully matured. See, e.g., Restatement (Second) of Contracts § 53 (Acceptance by Performance); cf. Winstar Corp. v. United States, 64 F.3d 1531, 1545 (Fed. Cir. 1995) ("When the plaintiffs satisfied the conditions imposed on them by the contracts, the

government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting . . . and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements."), aff'd and remanded, 518 U.S. 839 (1996).

### c.  There was Consideration

Consideration is a bargained-for performance or return promise.  See Restatement (Second) of Contracts § 71.  Here, the Government offered consideration in the form of promised advance CSR payments.  In return, L.A. Care developed compliant plans, offered those plans for sale on the California exchange, and made CSR reductions to its eligible customers.  Therefore, there was consideration.

### d.  The HHS Secretary Had Authority to Contract

Plaintiff must prove that the contract was executed by an officer with "actual authority to bind the Government."  Marchena v. United States, 128 Fed. Cl. 326, 333 (2016) (citing Salles v. United States, 156 F.3d 1383, 1384 (Fed. Cir. 1998)).  That authority "may be either express or implied."  Id.  Express actual authority is derived from the words of a statute or other provision.  McAfee v. United States, 46 Fed. Cl. 428, 435 (2000).  Authority is implied when it is "considered to be an integral part of the duties assigned to a government employee."  H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) (citation omitted).

Sections 1402 and 1412 provide that the Secretary of HHS "shall establish" the CSR program and "shall make" CSR payments.  More generally, the Secretary is responsible for administering and implementing the ACA.  See ACA §§ 1001, 1301(a)(1)(C)(iv), 1302(a)–(b), 1311(c)–(d).  The ACA itself creates a contractual framework that the HHS Secretary is charged with administering and implementing.  Entering into contracts pursuant to the contractual structure of the CSR program is therefore integral to the Secretary's duties.  Accordingly, the Secretary had implied actual authority to contract.

The Anti-Deficiency Act ("ADA"), 31 U.S.C. § 1341(a)(1)(B) is not fatal to L.A. Care's claim.  The Government points to language in the ADA providing that the Government "may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."  However, when a statutory or regulatory framework also creates a contract, that limitation is no longer applicable.  N.Y. Airways, 369 F.2d at 152.  When addressing this issue, the court in N.Y. Airways reasoned that "[s]ince it has been found that the Board's action created a 'contract or obligation (which) is authorized by law', obviously the statute has no application to the present situation."  369 F.2d at 152.  Similarly, the ACA explicitly authorizes the Secretary of HHS to make CSR payments.  And as stated above, sections 1402 and 1412 established a contractual framework.  Therefore, the Secretary is "authorized by law" under the ACA

to make CSR payments pursuant to implied-in-fact contracts with insurers, and the implied-in-fact contract does not fall under the Anti-Deficiency Act.

L.A. Care's assertion that it relied on the Government's promise to pay does not transform L.A. Care's implied-in-fact contract claim into an allegation of an implied-in-law contract that this Court is without jurisdiction to hear.  See Def.'s Cross-Mot. to Dismiss and Resp. at 27-28.  An assertion of detrimental reliance does not suddenly convert Plaintiff's well-pled implied-in-fact contract claim into one for promissory estoppel as the Government suggests.  Steinberg v. United States, 90 Fed. Cl. 435, 444-47 (2009).  Indeed, an allegation of detrimental reliance can be instructive on whether there was a meeting of the minds essential to the existence of an implied-in-fact contract.  Son Board., Inc. v. United States, 42 Fed. Cl. 532, 353 (1998).  A jurisdictional dismissal is only proper if Plaintiff's complaint asserts promissory estoppel while also failing to plead the elements of an implied-in-fact contract claim.  Steinberg, 90 Fed. Cl. at 444.  That is not the case here.  As already discussed, L.A. Care has satisfactorily pled the elements of an implied-in-fact contract.

Lastly, the Government argues that the existence of QHP Agreements—the contracts between issuers and the Government—preclude the formation of an implied contract since both it and the QHP Agreement are grounded in the same facts.  Def.'s Cross-Mot. to Dismiss and Resp. at 27.  However, L.A. Care does not claim that the QHP Agreements in any way evidenced an implied-in-fact contract.  Moreover, these agreements do not cover the same subject matter as Plaintiff alleges is covered by the implied contract.  Since this implied contract is not grounded in the same facts as the QHP Agreements, Defendant's attempt to evade liability is unsuccessful.

e.  The Government Breached the Contract

The Government is contractually required to make advanced CSR payments to issuers.  Moreover, by offering plans on the California exchange and paying eligible customers' out-of-pocket expenses, L.A. Care continues to fulfill its end of the bargain.  The Government's failure to pay from October 2017 and beyond constitutes a breach of this contract.  Congress' mere refusal to pay has not modified its contractual obligation in any way.  See, e.g., Salazar v. Ramah Navajo Chapter, 132 S.Ct. 2181, 2189 (2012) ("[T]he Government is responsible to the contractor for the full amount due under the contract, even if the agency exhausts the appropriation in service of other permissible ends.").  The Court therefore GRANTS Plaintiff's motion for summary judgment on Count VI.

C.  L.A. Care's Takings Cause of Action Fails to State a Claim Upon Which Relief May be Granted.

Lastly, L.A. Care alleges that when the Government discontinued making CSR payments, it took L.A. Care's property interest for public use without just compensation,

in violation of the Fifth Amendment.  The Government contends that L.A. Care does not have a legally cognizable property interest in these payments, and therefore fails to state a claim.

### 1.  Standard of Review

When considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the Court must accept as true all factual allegations submitted by the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Accepting those allegations as true, for the plaintiff to survive dismissal, the Court must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).  The plaintiff's factual allegations must be substantial enough to raise the right to relief above the speculative level, accepting all factual allegations in the complaint as true and indulging all reasonable inferences in favor of the non-movant.  Twombly, 550 U.S. at 545; Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2008).

### 2.  Stating a Takings Claim

The Fifth Amendment of the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  A takings claim is evaluated under a two-part analysis.  "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking.  Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'"  Acceptance Insurance Cos., Inc. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted).  To prevail on the Government's motion to dismiss, L.A. Care must only plead sufficient facts that, when accepted as true, show that it had a cognizable property interest in continued CSR payments, and that the Government's failure to make CSR payments constituted a taking of that interest.[7]

### a.  L.A. Care Has Alleged a Property Interest in CSR Payments

The Constitution "neither creates nor defines the scope of property interests compensable under the Fifth Amendment."  Maritrans, Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).  Instead, courts look to "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law" to

---

[7] "No statutory obligation to pay money, even where unchallenged, can create a property interest within the meanings of the Takings Clause."  Adams v. United States, 391 F.3d 1212, 1225 (Fed. Cir. 2004).  Thus, whether Plaintiff has sufficiently alleged a takings cause of action wholly depends on the existence of a contract between L.A. Care and the Government.

define the requisite property interest to establish a taking.  Id. (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1030 (1992)).  This broad standard for identifying Fifth Amendment property interests has been held to include intangible rights like contracts.  See Lynch v. United States, 292 U.S. 571, 579 (1954); Cienega Gardens v. United States, 331 F.3d 1319, 1329 (Fed. Cir. 2003) (recognizing "ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment").

For the reasons discussed above, L.A. Care has sufficiently alleged the existence of an implied-in-fact contract.  Since "[v]alid contracts are property," Lynch, 292 U.S. at 579, L.A. Care has pled facts sufficient to show that it possesses a legally cognizable Fifth Amendment property interest.

### b.  The Government Has Not Taken L.A. Care's Property

Though L.A. Care possesses a vested property right, that right has not been taken; it still can enforce this contract.  This Court recently had the opportunity to address this precise issue:

> If a plaintiff claims he is owed something to which he also claims a contractual right, he cannot also allege a takings claim because he is not alleging that the Government has "taken" his contract remedy.  Under such circumstances, the plaintiff is claiming he entered into a contract with the Government that the Government subsequently breached, leaving the plaintiff with contract damages.  The amount of those damages is also the property the plaintiff claims was taken.  In other words, "[t]he property rights allegedly taken were the contractual rights themselves, not a separately existing property interest."  Therefore, the plaintiff's remedy lies in contract, and he cannot pursue a takings claim to recover his alleged contract damages.

Snyder & Associates Aquisitions LLC v. United States, 133 Fed. Cl. 120, 126 (2017) (quoting Westfed Holdings, Inc. v United States, 52 Fed. Cl. 135, 152 (2002)) (other citations omitted).  Accordingly, L.A. Care has not stated a takings claim.  The Court GRANTS Defendant's motion to dismiss Count VII.

### Conclusion

The Government promised to make full and advanced CSR payments both in statute and through contract for which it is now liable.  L.A. Care should not be left "holding the bag" for taking our Government at its word.  For the reasons stated above, the Court GRANTS Plaintiff's motion for partial summary judgment on Counts V and VI, DENIES

Defendant's motion to dismiss Counts V and VI, and GRANTS Defendant's motion to dismiss Count VII of Plaintiff's complaint.

The Court requests that counsel for the parties submit a joint status report on or before March 14, 2019, indicating the proposed steps and schedule for completing the resolution of this action.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge